2010 OK 4

**Glenn COFFEE, President Pro Tempore of the Oklahoma State Senate and Chris Benge, Speaker of the Oklahoma House of Representatives, Petitioners,**

v.

**Brad HENRY, Governor of the State of Oklahoma, Respondent.**

No. 106,839.

Supreme Court of Oklahoma.

Jan. 26, 2010.

Fred Morgan, Cheryl Ann Purvis, Staff Counsel, Oklahoma State Senate, Lee Slater, Amy L. Alden, General Counsel, Oklahoma House of Representatives, Oklahoma City, Oklahoma, for Petitioners.

D. Kent Meyers, Harvey D. Ellis, Molly H. Tolbert, Crowe & Dunlevy, P.C., Stephen Cortes, General Counsel, Governor Brad Henry, Oklahoma City, Oklahoma, for Respondent.

REIF, J.

¶ 1 The President Pro Tempore of the Oklahoma Senate and the Speaker of the Oklahoma House of Representatives have petitioned this Court to assume original juris-

diction. They ask this Court to resolve their dispute with the Governor over use of the line item veto provided by Okla. Const. Art. 6, § 12. The Legislative Leadership specifically complains about two instances in the last Legislative session where the Governor used the line item veto to reject provisions in two bills—S.B. 1323 and H.B. 2286. The Legislative Leadership characterizes these bills as "general bills." They contend that use of the line item veto is limited to "appropriation bills." The Legislative Leadership asks this Court to issue a declaratory judgment that interprets Art. 6, § 12 as limiting the Governor's use of the line item veto to "appropriation bills," that is, bills that deal exclusively with appropriations. While the distinction between "general bills" and "appropriation bills" may be determinative in other contexts, the language of Art. 6, § 12 is determinative of the controversy at hand.

■ ¶2 The text of Okla. Const. Art. 6, § 12 reads as follows:

Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills: Provided, That this section shall not relieve emergency bills of the requirement of the three-fourths vote.

Nothing in the language of this provision reflects that it is limited to bills that deal exclusively with appropriations; rather, the language plainly indicates it applies to "*Every* bill ... making appropriations ... embracing distinct items." (Emphasis added.)

■ ¶3 The term "every" ordinarily means "any" or "all" and suggests a broad expansive meaning, *Christianson v. City of Bismarck,* 476 N.W.2d 688 (N.D.1991); it is considered a term of inclusion. *See Rockfield v. First Nat. Bank of Springfield,* 77 Ohio St. 311, 83 N.E. 392 (1907). Clearly, the scope of Art. 6, § 12 goes well beyond just bills that deal exclusively with appropriations and extends to any and all bills that "mak[e] appropriations ... embracing distinct items."

■ ¶4 Examination of S.B. 1323 and H.B. 2286 reveals that each of these bills "mak[e] appropriations ... embracing distinct items." That is, S.B. 1323 added conditions and restrictions for the expenditure of funds previously generally appropriated to the Department of Corrections, while H.B. 2286 added a restriction on the use of funds previously appropriated to the Ethics Commission to purchase computer software. These additions "mak[e] appropriations" because they materially change the predicate authorization for such funds to be paid out of the State treasury as provided in Okla. Const. Art. 5, § 55. This constitutional provision commands, in pertinent part, that "No money shall ever be paid out of the treasury of this State ... except in pursuance to an appropriation by law." The restrictions in S.B. 1323 and H.B. 2286 necessarily affect the payment of funds out of the State treasury for the items embraced, because the funds in question cannot be paid out contrary to the restrictions. Stated another way, these restrictions supplement the original general appropriations and govern the payout of funds on the items they embrace.

■ ¶5 In summary, the framers of the Oklahoma Constitution provided a classic system of checks and balances for the expenditure of public funds. The framers first required expenditures to be based on bills that make appropriations and made any and all such bills subject to the scrutiny and line item veto of the Governor, including bills that materially change prior appropriations by adding conditions or restrictions that affect the payout of the funds from the State treasury. The framers clearly intended the Governor to play a critical role at every stage of the appropriations process. As a counter-check or balance on the exercise of line item veto power by the Governor, the framers

authorized the Legislature to repass a "bill, or any item or appropriation therein" that the Governor may have disapproved.

¶ 6 Accordingly, this Court assumes original jurisdiction of this dispute between the Legislature and the Governor over the exercise of their respective constitutional powers in regard to the making and approval/disapproval of appropriations of public funds. We enter a declaratory judgment that (1) rejects the challenge by Legislative Leadership to the Governor's use of line item veto power in review of bills that add conditions or restrictions to funds that have been previously appropriated and (2) holds the Governor may use the line item veto provided in Art. 6, § 12 in review of bills by the Legislature that add conditions or restrictions to previously appropriated funds, because such bills form a part of the predicate appropriation for the payout of funds from the State treasury as provided in Art. 5, § 55.

## ORIGINAL JURISDICTION ASSUMED, OKLA. CONST. ART. 7, § 4; DECLARATORY RELIEF GRANTED, HOLDING GOVERNOR MAY USE LINE ITEM VETO IN REVIEW OF BILLS THAT ADD CONDITIONS OR RESTRICTIONS TO PREVIOUSLY APPROPRIATED FUNDS.

¶ 7 EDMONDSON, C.J., KAUGER, WATT, COLBERT, and REIF, JJ., concur.

¶ 8 TAYLOR, V.C.J., HARGRAVE, OPALA, and WINCHESTER, JJ., dissent.

KAUGER, J., concurring:

¶ 1 I fully concur with the majority. It holds that every bill making appropriations is subject to the Governor's line-item veto. Although our previous cases may not be written in the clearest language, when they are clearly analyzed there is no question that the Governor vetoed appropriation bills.

¶ 2 However, there is another rationale for reaching this conclusion. Because H.B. 2286 and S.B. 1323 supplement and amend appro-

priations made in the general appropriations bill HB 2276, the appropriations were incorporated into the subsequent bills, thus subjecting them to the Governor's line-item veto. In *Opinion of the Justices to the Governor*, 373 Mass. 911, 370 N.E.2d 1350 (1977), the State of Massachusetts reached the same result in a similar case. The opinion provides at p. 1352:

> Each new item sets apart from the public revenue a certain sum of money for a specified object, in such manner that the executive officers of the government are authorized to use that money, and no more, for that object and for no other. It is therefore an appropriation.... The Legislature cannot narrow the Governor's power to disapprove such an item by stating it in words and phrases rather than in figures.

> If the Governor could not veto such a new item the way would be open for evasion of the item veto by a two-step process. The Legislature could first make a noncontroversial appropriation. Once that was enacted, it could then insert the controversial restriction as a separate section in an essential supplementary appropriations bill.[1]

(Citations omitted.)

This should be the end of the discussion. However, I am compelled to write further to address our precedents.

¶ 3 Here's what happened. On April 29, 2008, the Governor of the State of Oklahoma approved House Bill No. 2276, a general appropriation bill which appropriated money for the expenses of various agencies of the executive, legislative, and judicial departments of the state. Included in the money appropriated by H.B. No. 2276 were appropriations to the Ethics Commission and the Department of Corrections.[2] Subsequently, the Legislature, in House Bill 2286 and Senate Bill 1323, sought to define the object of the appropriation by purporting to impose detailed constraints regarding the funds previously appropriated by H.B. 2276.

---

1. This case is cited strictly for the principle that an amendment to an appropriations bill, that redirects or places new conditions on money already appropriated, is itself an appropriation.

2. House Bill No. 2276 at § 39 appropriated to the Ethics Commission the sum of $667,960.00 and at § 95 to the Department of Corrections $483,000.00.

¶ 4 The Governor vetoed the legislative mandate within H.B. 2286 for the Ethics Commission which required it to use a specified amount of its appropriation to purchase particular computer software, and he vetoed the legislative mandate within S.B. 1323 for the Department of Corrections to "budget" specified amounts of its appropriation for delineated purposes. The petitioners, the President Pro Tempore of the Senate and the Speaker of the House, brought this original proceeding in this Court to challenge the Governor's ability to exercise such a line-item veto.

¶ 5 The Petitioners argue that H.B. 2286 and S.B. 1323 are not appropriation bills subject to the Governor's veto authority as provided by the Oklahoma Constitution art. 6, § 12 which provides:

Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills: Provided, That this section shall not relieve emergency bills of the requirement of the three-fourths vote.

**3.** Webster's New International Dictionary 133 (2ed. 1950).

**4.** The Oklahoma Legislature provides a "Glossary of Legislative Terms" for the public. It is available on line at http//www.oksenate.gov. legislation/glossary.html. Appropriation and Budget are both defined within the glossary. It also defines "budget" as an "estimate of the receipts and expenditures needed to carry out programs for a fiscal project."

**5.** The Okla. Const. art. 5, § 55 provides:

No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor

This provision involves the Governor's authority to line-item veto "appropriations of money embracing distinct items." Over 100 years after the enactment of this Constitutional provision, the Court still cannot unanimously agree upon what an appropriation of money embracing distinct items means—perhaps because the definition seems so simple. The Constitution does not define "appropriation," but according to the dictionary it means "money set aside as for a specific purpose." [3] The Legislature has adopted the same definition. It defines "appropriation" as "a legislative allocation of funds for a specific purpose." [4]

¶ 6 The precise question is whether two bills which add conditions and restrictions for the expenditure of funds previously generally appropriated meet that definition; the majority concludes that it does. Why? Because the bills supplement the original general appropriation bill and govern the payment of funds on the items they embrace—thus coming within the term "every appropriation." To construe these measures any other way would defy what the framers of the Oklahoma Constitution were attempting—to provide a classic system of checks and balances for the expenditures of public funds.

¶ 7 The only way to sort this out is to start at the very beginning. The Oklahoma Constitution art. 5, § 55 also uses the words "appropriation by law." [5] In 1910, the syllabus of Court in *Menefee v. Askew*, 1910 OK 47, 25 Okla. 623, 107 P. 159, first defined [6] "appropriation" as:

unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum.

**6.** When this Court used "syllabus," the syllabus contained the law of the case and the body of the opinion was merely dictum. *Robinson v. Oklahoma Nephrology Associates, Inc.*, 2007 OK 2, ¶ 13, fn. 2, 154 P.3d 1250; *Corbin v. Wilkinson*, 1935 OK 977 ¶ 0, 52 P.2d 45. The reasoning of the court in the body of the decision was an aid to the interpretation of the law expressed in the syllabus. *Robinson*, supra.

1. STATE FINANCE—"Appropriation." An "appropriation" in this state is an authority of the Legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum, from a designated fund out of the treasury in a given year, for a specified object or demand against the state.

In other words: money set aside (by the Legislature) for a specific purpose. Here, the Legislature set aside money for the Department of Corrections to use in a particular year, and it set aside money for the Ethics Commission to use for computer software only.

¶ 8 The second syllabus of *Menefee* is particularly helpful. It provides:

2. STATE FINANCE—Appropriation—Form. No arbitrary form of expression or particular words are required by the Constitution in making an appropriation, *which may be made by implication when the language employed reasonably leads to the belief that such was the intention of the Legislature.* (Emphasis supplied.)

The Okla. Const. art. 6, § 12 is an exception to the Governor's veto power, and the *Menefee* Court recognized that there may be attempts by future Legislatures to bypass the Governor's ability to line-item veto by artfully crafting legislation that, at first glance, may not appear to be an express appropriation of any funds.

¶ 9 The exception to the rule is what this is all about. It is the exact situation which the *Menefee* Court foresaw. The legislation at issue appropriated funds and then added conditions and restrictions to the expenditure of the funds. Taken collectively, the legislation reasonably leads one to the finding that the intention of the Legislature was to make an appropriation, but carefully bypass the Governor's ability to line-item veto by splitting the appropriation into multiple bills. In fact, as the language in *Menefee* shows, *Menefee* actually supports this conclusion.

¶ 10 However, *Menefee* alone is not dispositive, because it involved a direct, specific, sum-certain appropriation for the salary of the Game and Fish Warden. Nor is *Meyer v. Clift,* 1912 OK 201, 31 Okla. 793, 123 P. 1042, dispositive.[7] In *Meyer,* the legislature merely specified what a stenographer for the district court should be paid by the county treasury. The Court, relying on *Menefee v. Askew,* 1910 OK 47, 25 Okla. 623, 107 P. 159, held that the statute neglected to make any appropriation for salaries, just as portions of the statute in *Menefee* which had designated unspecified amounts to be paid as reimbursements for expenses were struck down because they didn't "allocate" a sum-certain. Nevertheless, the teachings of *Menefee,* in its entirety, apply.

¶ 11 In 1911, the Court decided *Regents of State University v. Trapp,* 1911 OK 62, 28 Okla. 83, 113 P. 910, which involved, for the first time, a challenge to the Governor's authority to line-item veto pursuant to art. 6, § 12.[8] Dicta in *Trapp* suggests that when the Legislature enacts legislation—including one section of the bill which appropriates a specified sum to a University and another section of the same bill apportioning the appropriated money in a specified way—the second section is not an "appropriation" in which the Governor may approve in part, disapprove in part or direct how the funds shall be apportioned. A similar situation was presented in *Carter v. Rathburn,* 1922 OK 105, 85 Okla. 251, 209 P. 944, where the Court considered the Governor's act in disapproving a portion of a bill which appropriated $1500.00 for salary for a clerk in the State Examiner's office and the very next day, attempted to approve the bill as to all items except those "specifically marked disapproved."

■ In actuality, both *Trapp* and *Rathburn* involve the question of the timeliness of the Governors' actions. The fact that these cases stand for this and for nothing else was

---

7. It should be noted that the concurring opinion in *Johnson v. Walters,* 1991 OK 107 at ¶¶ 5–7, fn. 10–13, 819 P.2d at 703, relied on these authorities for the limited proposition that: 1) the Governor's powers are limited by the Constitution; 2) the Chief Executive may exercise only the power specifically granted; and 3) any attempt to exceed this authority results in the actions being rendered wholly ineffectual for any and every purpose.

8. The Okla. Const. art. 6, § 12, ¶ 5, supra.

expressly and clearly pointed out by the Court in *Peebly v. Childers,* 1923 OK 595, 95 Okla. 40, 217 P. 1049. When counsel in *Peebly* argued that *Trapp*'s holding governed the Governor's actions regarding line-item vetoes, the Court said "[w]e are wholly unable to agree with the conclusion reached by counsel as to the controlling effect of the *Trapp* Case. We think that when the opinion in the *Trapp* Case is carefully analyzed and rightly understood, it furnishes a precedent against rather than in favor of counsel's contention." This same language is applicable here.

¶ 13 Unfortunately, the rationale of *Peebly* or its holding is of little help because it involved a Governor who went through a bill and reduced dollar amounts rather than disapproving them *in toto.* The *Peebly* Court held that the Governor was required to disapprove objectionable items *in toto,* rather than merely approve parts and disapprove parts by changing the dollar amounts—this is not what happened here.[9]

¶ 14 The Court reaffirmed the teaching of *Menefee, supra,* when it recognized again in *Riley v. Carter,* 1933 OK 448, 165 Okla. 262, 25 P.2d 666, that "[t]his state is committed to the rule that no particular words need be used in making an appropriation, and that an appropriation may be implied where the language used reasonably leads to the conclusion that such was the intention of employment of those words." It recognized this teaching because it held that an "appropriation by law" as used in the Constitution is not limited to Legislative appropriations, but constitutional appropriations as well.

¶ 15 Another interesting case is *State ex rel. Murray v. Carter,* 1934 OK 132, 167 Okla. 473, 30 P.2d 700, a case involving the State Auditor's refusal to pay funds authorized by the State Board of Public Affairs because the funds were paid pursuant to a statute that transferred funds based upon a conditional event and upon the Governor's approval. The Auditor argued that the Legislature exceeded its authority by making items of appropriation in an institutional appropriation bill dependent on the existence of a fact happening or taking effect in the future. The *Murray* Court, in discussing the legislation, looked at five non-exclusive factors which indicated whether the legislation was an appropriation under art. 5, § 55 of the Oklahoma Constitution and whether the State Auditor had to pay the funds.[10]

¶ 16 This is an entirely different issue than the one before us—whether the Governor's action exceeded his authority to line-item veto "appropriations of money embracing distinct items." Rather, the proper analysis to resolve this question can be found in *Edwards v. Childers,* 1924 OK 652, 102 Okla. 158, 228 P. 472, and its progeny. *Edwards* involved similar legislation, which at first glance did not appear to qualify as an appropriation. In 1923, the Legislature levied a tax of two and one-half cents a gallon to place in a special "State Highway Construction and Maintenance Fund." It also created a commission to oversee the fund and directed how that money would be expended for repair, maintenance, and building of new highways. The legislation was challenged as not qualifying as an appropriation because it did not distinctly specify the sum appropriated and the object to which it was to be used.

¶ 17 The *Edwards* Court concluded that the challenged legislation qualified as an appropriation because it created a special fund, appropriated and directed it to be expended for a special purpose and in an express manner, and the amounts to be appropriated were the entire fund. In short, the fund was capable of being mathematically calculated. The Court again recognized that no arbitrary form of expression or particular words were required in making an appropriation, but that it could be made by implication, when the language employed reasonably leads to the belief that such was the intent of the Legislature. In *Edwards,* it was apparent

---

9. It is interesting to note that the people solved this problem later, at least in regard to the Regents, when they enacted art. 13A, § 3 of the Okla. Const. which requires the Legislature to make one consolidated appropriation and the Regents to then allocate the funds.

10. The Okla. Const. art. 5, § 55, see note 5, supra.

that the Legislature, through the language of the statutes, intended to set apart money from this specially created fund for the sole use of the department for the construction and maintenance of state highways. In other words, the Legislature quite clearly set aside money for a specific purpose.[11]

¶ 18 It is, however, the teachings rather than the facts of *Edwards* which are particularly helpful. *In re Initiative Petition No. 332*, 1989 OK 93, ¶¶ 11–13, 776 P.2d 556 further explains *Edwards:*

> The main teaching of Edwards, which is the foundation upon which it is based and upon which it distinguishes Menefee, is the fundamental and absolute division of governmental power, and the exclusion of the executive from the appropriation and disbursement of public funds.
>
> ¶ 12 As a matter of historical perspective, the Court in Edwards observed that the provisions of art. 5, § 55 exist to curb the power of the monarch to save the people from the prodigality of the King.[12]
>
> ¶ 13 The Court observed that an appropriation of public funds to a department of state does not conflict with the specific sum requirement if it leaves no power in the department to use or expand any funds except as the lawmakers reviewed, considered and thereafter determined to allocate.

The concept upon which both of these cases rely is the notion that an "appropriation" is akin to that which is defined in the dictionary [money set aside for a specific purpose] or by the Legislature [a legislative allocation of funds for a specific purpose].

¶ 19 The Court further addresses this subject of improper delegation of the legislative appropriation process in *Wells v. Childers*, 1945 OK 365, 196 Okla. 353, 165 P.2d 371 at ¶ 36:

> ... [G]ubernatorially created objects of expenditures would constitute an appropriation, a function exclusively legislative. As a matter of fundamental principle, the Legislature may not create any fund, designate it an appropriation, and delegate determination of the objects of expenditure to any executive or administrative officer at his discretion. So to do not only would violate the Constitution (art. 5, § 55), requiring the distinct specification of the object to which it may be applied; additionally, such legislative authority sought to be delegated would violate section 1, art. 4, Constitution, by which the government is divided into three separate and distinct departments and in which it is provided that neither shall exercise the powers properly belonging to either of the others.

¶ 20 The rationale of *Edwards, supra, In re Initiative Petition No. 332, supra,* and *Wells, supra,* is applicable. When it is clear from the questioned legislation that the intent of the Legislature was to set aside money for a specified purpose, and that it is not an attempt by the Legislature to delegate to another branch the ability to allocate an unspecified sum of money for a unspecified, discretionary purpose, the measure qualifies as an appropriation. Here, S.B. 2286 set

---

**11.** *Edwards v. Childers*, 1924 OK 652, 228 P. 472, also explains the purpose of the appropriation requirement as:

¶ 11 ... This law was brought into being to curb the power of the monarch, to save the people from the prodigality of the king. This requirement was not intended, nor was it originally so worded as to protect the people from the ill-advised judgment and extravagance of Parliament itself. It merely made the will of the lawmakers paramount to that of the Crown in the expenditure of public funds. Neither the people nor their Parliament, by this law, sought to curb or regulate their own powers ...

¶ 12 So, it would seem that an act appropriating public funds to be used by a department of state conflicts in no wise with the letter or spirit of this law if it leaves no power in such department to use or expend any fund except those

funds which the lawmakers viewed and considered, and, so beholding, clearly instructed such department to employ. In such case the department is restricted by legislative will to a definite limit for purposes stated.

¶ 13 In both sections of the statute under consideration, the Legislature has given the department an impressive command that all the moneys in this specific fund "shall be expended" for purposes and in the manner therein provided ...

**12.** The Oklahoma Court of Criminal Appeals, in *Ex parte Pope*, 1925 OK CR 610, 242 P. 290, explains the concept of constitutional provisions dealing with "appropriations" as the intent of the sovereign people to keep a firm hand on the public purse strings, by limiting the power to spend money without an appropriation.

aside the funds previously appropriated in H.B. 2276 to be used for budgeting for Fiscal year 2009 or 2010. H.B. 2286 set aside $50,000.00 of the funds previously appropriated by H.B. 2276 to be used to purchase computer software. Clearly both bills set aside dollars to be used for a specific purpose—each qualifying as an appropriation. Because each qualifies as such, the provisions of Section 12, art. 6 of our Constitution [13] provide the Governor with line-item veto authority.

## CONCLUSION

¶ 21 It is well-settled that no particular words are required by the Constitution in making an appropriation. It may be made by implication, when the language employed reasonably leads to the belief that such was the intention of the Legislature.[14] This is illustrated in our recent case of *Fent v. State ex rel. Office of State Finance*, 2008 OK 2, ¶ 17, 184 P.3d 467 when we said:

> Even though drafted in terms of "transferring" and "allocating," H.B. 1105 unmistakably appropriates nearly 135 Million Dollars from the General Revenue Fund. It is an appropriation bill, and it must satisfy

the requirements of an appropriation law set out in art. V, §§ 55 and 56 of the Oklahoma Constitution.[15]

An appropriation may also be made by an amendment to an existing bill.[16] The questioned legislation does not appear to be an attempt by the Legislature to expand to another branch the power to use or expend any funds except those which the lawmakers allocated and considered and required to be expended for a specified purpose. Consequently, these measures also qualify as an allocation, subject to the provisions of art. 6, § 12 of our Constitution.[17]

¶ 22 These are the facts.[18] In House Bill 2286 and Senate Bill 1323, the Legislature sought to define the object of the appropriation by purporting to impose detailed constraints regarding the funds previously appropriated by H.B. 2276 by amending the bill. The Governor vetoed the legislative mandate within H.B. 2286 for the Ethics Commission which required it to use a specified amount of its appropriation to purchase particular computer software, and he also vetoed the legislative mandate within S.B. 1323 for the Department of Corrections to "budget" specified amounts of its appropria-

---

13. The Okla. Const. art. 6, § 12, see ¶ 5, supra.

14. *In re Oklahoma Turnpike Auth.*, 1950 OK 208, ¶ 54, 221 P.2d 795; *State ex rel. Murray v. Carter*, 1934 OK 132, ¶ 19, 30 P.2d 700; *Leininger v. Minter*, 1929 OK 464, ¶ 12, 139 Okla. 169, 281 P. 801; *Edwards v. Childers*, 1924 OK 652, ¶ 8, 228 P. 472; *Menefee v. Askew*, 1910 OK 47, ¶ 8, 107 P. 159.

15. *Fent v. State ex rel. Office of State Finance*, 2008 OK 2, ¶ 17, 184 P.3d 467 also provides in pertinent part:

> ¶ 18 As required by art. V, § 55, the provisions in H.B. 1105 distinctly specify the amount appropriated to each agency or revolving fund. The provisions do not distinctly specify the object to which the money is to be applied for each and every specific amount appropriated to a revolving fund, but the object can be determined by reference to other statutes creating or relating to the revolving fund. For instance, the object to which money in the State Emergency Fund is to be applied can be determined by reference to the statutes governing the revolving fund such as 62 O.S.Supp. 2006, § 139.47. Article V, § 55 provides that it is insufficient to refer to another law to determine the specific amount of the appropriation, but it does not extend the restriction against

referring to another law to determine the object to which the appropriated amount shall be applied. The restriction against referring to another law to determine the amount appropriated will be strictly construed and will not be extended to other matters not covered by the restriction. *Tate v. Logan*, 1961 OK 136, ¶ 19, 362 P.2d 670, 674–675. Accordingly, H.B. 1105 is consistent with the provisions to make an appropriation by law in art. V, § 55 even though reference to other statutes is necessary to determine the objects or purposes of some of the appropriations.

16. *Opinion of the Justices to the Governor*, 373 Mass. 911, 370 N.E.2d 1350, 1352 (1977).

17. The Okla. Const. art. 6, § 12, see ¶ 5, supra.

18. Perhaps John Adams, writing in defense of the British soldiers in the Boston Massacre Trials, said it best:

> "Facts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence."

J. Adams, Argument in Defense of the [British] Soldiers in the Boston Massacre Trials [December 1770].

tion for delineated purposes. It is undisputed that art. 6, § 12 is an exception to limitations of the Governor's veto. It preserves the Governor's line-item veto and shields the Governor from becoming a "super-legislator." To hold otherwise would render art. 6, § 12 null, void, and useless.

TAYLOR, V.C.J., with whom OPALA and WINCHESTER, JJ., join, dissenting:

¶ 1 I respectfully dissent from today's declaratory ruling that a legislative bill adding conditions upon the expenditure of appropriated money constitutes an appropriation bill subject to the Governor's line-item veto. Today's ruling wholly ignores the unambiguous requirements of an appropriation bill set out in the Oklahoma Constitution, art. 5, § 55 and implicitly overrules the time-honored principles governing the line-item veto in the Oklahoma Constitution, art. 6, § 12. Contrary to the separation of powers mandate in the Oklahoma Constitution, art. 4, § 1, today's ruling restricts the Legislature's power to control the state's purse while it enlarges the Governor's veto power over legislation.

¶ 2 Relying on Article 5, § 55, today's decision redefines an appropriation bill to include any bill that places conditions or restrictions on the budgeting and expenditure of money previously appropriated. This definition is inconsistent with the plain language of Article 5, § 55 and the long-standing, untarnished pronouncements on the meaning of "appropriation" under Article 5, § 55 set out in *Menefee v. Askew*, 1910 OK 47, 25 Okla. 623, 107 P. 159, and *Meyer v. Clift*, 1912 OK 201, 31 Okla. 793, 123 P. 1042.

¶ 3 Article 5 of the Oklahoma Constitution, the article on the legislative department, at § 36, vests legislative authority over all rightful subjects in the state legislature. Article 5, § 55, on the other hand, restricts the exercise of legislative authority to spend the state's money. It requires the state legislature **to make an appropriation by law** in a specified amount for a specified object before the money may be paid out of the state treasury. In other words, the enactment of

an appropriation by law is the exclusive procedure by which the state legislature may authorize money to be paid out of the state treasury, regardless of any other methods that may be devised. Article 5, § 55 reads:

No money shall ever be paid out of the treasury of this State, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, nor unless such payments be made within two and one-half years after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum.

¶ 4 *Menefee v. Askew*, 1910 OK 47, 25 Okla. 623, 107 P. 159, defined an appropriation in accordance with Article 5, § 55. *Menefee v. Askew*, in No. 1 of the *Syllabus*, concluded:

An "appropriation" in this state is an authority of the Legislature, given at the proper time and in legal form to the proper officers, to apply a distinctly specified sum, from a designated fund out of the treasury in a given year, for a specified object or demand against the state.

¶ 5 The question in *Menefee v. Askew* was whether a legislative enactment appropriated money. The legislation in *Menefee v. Askew* provided that game and fish license fees shall be placed to the credit of the game protection fund and that the Game and Fish Warden's $1,800.00 annual salary, annual travel expense not to exceed $800.00, and necessary office expenses shall be paid out of the game protection fund. *Menefee v. Askew* held that the legislation, as required by Article 5, § 55, validly appropriated a sum certain for the Game and Fish Warden's salary from the game protection fund but did not make a valid appropriation for the Game and Fish Warden's stenographer because it did not specify a sum certain for necessary office expenses.[1]

1. In the remainder of its syllabus, *Menefee v. Askew* ruled that Article 5, § 55 does not require the Legislature to use an arbitrary form of ex-

pression or any particular words to make a **valid** appropriation:

¶ 6 Shortly after *Menefee v. Askew, Meyer v. Clift,* 1912 OK 201, 31 Okla. 793, 123 P. 1042, determined that a legislative enactment fixing the salary of a stenographer did not constitute an appropriation by law authorizing the payment of money from the state treasury as required by Article 5, § 55. *Meyer v. Clift,* in the *Syllabus,* held:

> Section 23, c. 69, Sess. Laws 1910, providing that stenographers for the district court and for the superior court shall receive an annual salary of $1,200, the salary of stenographer of the district court to be paid out of the state treasury in the same manner as salaries of district judges, does not constitute an appropriation for the payment of salaries of stenographers for the district court; and by reason of section 2527, Comp. Laws 1909, it is unlawful for the State Auditor to issue a warrant for the salary of a stenographer of the district court for the months of July, August, September, and October, 1911, since there is no appropriation by law for the payment of such salary.

¶ 7 Under *Meyer v. Clift,* Article 5, § 55 cannot be read to include all bills that make an appropriation **or** that add conditions upon the expenditure of money appropriated in some other legislative enactment. The teaching of *Meyer v. Clift* is that a legislative enactment placing conditions upon expenditures, such as fixing salaries, is not within the meaning of "appropriation" as that term is used in Article 5, § 55.

¶ 8 The *Menefee v. Askew* and *Meyer v. Clift* decisions were handed down shortly after the adoption of the Oklahoma Constitution and Oklahoma statehood. A few years later *Riley v. Carter,* 1933 OK 448, 165 Okla. 262, 25 P.2d 666, determined that an "appropriation by law" as used in Article 5, § 55 included constitutional appropriations. The dispute in *Riley v. Carter* arose out of the Legislature's failure to make an appropriation for the salaries of the justices on this Court. *Riley v. Carter* held that the schedule attached to the Oklahoma Constitution as adopted by the voters made "an appropriation by law" for the justices' salaries. Extending the meaning of "appropriation by law" in Article 5, § 55 beyond the pronouncements in *Menefee v. Askew* and *Meyer v. Clift, Riley v. Carter* reaffirmed the principles enunciated in those decisions:

> The authors of the opinions in *Menefee v. Askew,* supra, and *Meyer v. Clift,* supra, were members of the Constitutional Convention, and the opinions were filed but a short time after the adoption of the Constitution. For these reasons, the opinions are rightfully entitled to great weight in

No. 2. No arbitrary form of expression or particular words are required by the Constitution in making an appropriation, which may be made by implication when the language employed reasonably leads to the belief that such was the intention of the Legislature.

No. 3. Sections 9, 10, art. 4. c. 19, p. 303, Sess. Laws 1909, in connection with sections 3, 13, art. 6, c.19, constitute a valid appropriation as to the salary of the Game and Fish Warden in the sum of $ 1,800 per annum, and his actual necessary traveling expenses, not to exceed $ 800 per annum, and the salaries of not exceeding eight deputy game and fish wardens each in the sum of $ 800 per year and their each actual, necessary expenses, not to exceed $ 600 per annum, while actually employed under the direction of the State Game and Fish Warden, as controlled by sections 55 and 56, art. 5, of the Constitution, but continue in effect as an appropriation for two years and one-half only after the passage of said act.

No. 4. The provision of section 3, art. 6, providing that the Game and Fish Warden shall be reimbursed for his actual and necessary expenses, including expenses of catching and shipping game for propagating purposes, to be paid monthly and in the same manner as his salary and traveling expenses, does not constitute a valid appropriation, as the sum certain appropriated is not distinctly specified.

In this regard, *Fent v. State ex rel. Office of State Finance,* 2008 OK 2, 184 P.3d 467, 475, ruled that the transfer of surplus funds constituted an appropriation:

> ¶ 17 Even though drafted in terms of "transferring" and "allocating," H.B. 1105 unmistakably appropriates nearly 135 Million Dollars from the General Revenue Fund. It is an appropriation bill, and it must satisfy the requirements of an appropriation law set out in art. V, §§ 55 and 56 of the Oklahoma Constitution.

Unlike this case, the legislation involved in *Menefee v. Askew* and in *Fent v. Office of State Finance* expressed clear intent to appropriate specific sums of money from designated funds of the treasury to be expended for specific purposes in a given year. The legislation challenged in this case merely directs the budgeting of money that was appropriated in other legislative measures. See Appendices A and B attached hereto.

the construction of constitutional provisions.

*Riley v. Carter*, 25 P.2d at 676.

¶ 9 The general rules of construction governing the interpretation of our constitution require us to ascertain the intent and purpose of the provision at the time of its adoption.[2] *Carter v. Rathburn*, 1922 OK 105, 85 Okla. 251, 209 P. 944, 952. Today's ruling that the legislation or a part of it which adds conditions or restrictions to previously appropriated money constitutes an appropriation disregards the applicable rules of constitutional construction and turns *Menefee v. Askew* and *Meyer v. Clift* upside down. It also disregards the doctrine of stare decisis that ordinarily binds this Court to its established precedent. *Campbell v. White*, 1993 OK 89, ¶ 14, 856 P.2d 255, 260.

¶ 10 A year after *Riley v. Carter*, this Court articulated five requirements of an appropriation bill under Article 5, § 55. *State ex rel. Murray v. Carter*, 1934 OK 132, 167 Okla. 473, 30 P.2d 700, in No. 3 of the *Syllabus*, determined:

"Said section 55 of art. 5, supra requires an appropriation bill to meet five requirements, as follows, to wit: (a) Make an appropriation of money, (b) provide for its payment within 30 months, (c) specify the sum appropriated, (d) state the object to which said sum shall be applied, and (e) not require reference to any other law to fix the sum appropriated." Menefee Case, supra.

¶ 11 Guided by the above, long-standing decisions, the two legislative measures at issue in this controversy are not appropriation bills under Article 5, § 55. Neither legislative measure meets Article 5, § 55's threshold requirement of "making a new appropriation, or continuing or reviving an appropriation." Both of them relate to the budgeting of **previously** appropriated money. Today's decision, however, classifies the challenged legislation as appropriation bills under Article 5, § 55 by redefining appropriation bills to include not only bills that make appropriations of money **but also** bills that place conditions or restrictions on the budgeting and expenditure of money previously appropriated. Today's expanded meaning of an appropriation bill to include bills related to budgets and expenditures silently overrules *Menefee v. Askew, Meyer v. Clift,* and *Murray v. Carter*'s five fundamental requirements of an appropriation under Article 5, § 55.

¶ 12 Recognizing that appropriation bills are distinct from general legislative measures, the Court declares that this distinction is not determinative of the instant controversy and turns to the language in Section 12 of Article 6 of the Oklahoma Constitution. Article 6 of the Oklahoma Constitution, the article on the executive department, confers specific authority upon the Governor to participate in the legislative process as set out in §§ 11 and 12. Sections 11 and 12 grant the Governor the power to disapprove legislative measures and prescribe the manner in which the Governor may exercise the power. While § 11 grants the Governor power to veto a legislative measure in toto,[3] § 12

2. The recent opinion in *South Tulsa Citizens Coalition, LLC, v. Ark. River Bridge Auth.*, 2008 OK 4, ¶ 11, 176 P.3d 1217, 1220, reaffirmed the general rules that the intent of the framers and the people adopting it must be given effect in construing constitutional provisions and that, absent an ambiguity, the intent is settled by the language of the provision itself and the courts are not at liberty to search beyond the instrument for meaning.

3. The Oklahoma Constitution, art. 6, § 12 is an exception to the limitations on the Governor's veto power in art. 6, § 11. Section 11 reads:

Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the Jour-

grants the Governor power to veto an appropriation item without disapproving of the entire appropriation bill. Article 6, § 12 reads:

> Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the Governor; if he disapproves the bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill. Any item or items so disapproved shall be void, unless repassed by a two-thirds vote, according to the rules and limitations prescribed in the preceding section in reference to other bills: Provided, That this section shall not relieve emergency bills of the requirement of the three-fourths vote.

The Court then looks to North Dakota and Ohio for the meaning of "every," "any" and "all" as used in Article 6, § 12. In so doing, this Court is again overlooking our long-standing jurisprudence.

¶ 13 Two early decisions from this Court should control today's ruling: *Regents of State University v. Trapp*, 1911 OK 62, 28 Okla. 83, 113 P. 910, and *Carter v. Rathburn*, 1922 OK 105, 85 Okla. 251, 209 P. 944. *Regents of State University v. Trapp*, at No. 1 of the *Syllabus*, held:

> Section 12, art. 6. Constitution, providing that the Governor may disapprove any item of a bill making appropriations of money embracing distinct items, does not apply to a special appropriation bill containing only one item of appropriation for the support and maintenance of the State University; and the act of the Governor approving the bill in part and disapproving other parts thereof, directing how the funds appropriated shall be apportioned, is a nullity.

¶ 14 The special appropriation bill in *Trapp* made a single appropriation and provided for the expenditure of the single appropriation and appropriations made in other acts of the Legislature for fiscal years 1909–1910 and 1910–1911. Our first Governor disapproved some of the expenditures in the legislative measure, and our first Supreme Court declared that the legislative measure did not become law because the Governor did not approve the entire bill as required by Article 6, § 11. In doing so, the *Trapp* court said:

> The meaning of the foregoing section [Okla. Const., art. 6, § 12] is not obscure, and the object it was intended to accomplish is apparent. Without that provision, all bills of whatever character could be approved or disapproved by the Governor only in their entirety [under Okla. Const., art. 6, § 11]. But by section 57, art. 5, general appropriation bills may embrace more than one subject; and if the veto power were confined to the whole bill, the Governor might often be required to destroy much good legislation in order to defeat one item of a bill that was bad, or, on the other hand, be compelled to approve a piece of legislation vicious in part, in order to obtain the benefits of the salutary provisions of the same act. It was to enable the Governor to approach in a measure the consideration and approval of a bill carrying items of appropriation with the same power that the members of the legislative department are authorized to act upon it, in that he may consider and approve some of the items separately without being required to approve them all. But this power is conferred upon him only as to bills that make appropriations of money "embracing distinct items," and it was contemplated that it should apply only to those bills where more than one item of appropriation was made. Whether the power to approve some of the distinct items of an appropriation bill and to disapprove others carries with it the power to reduce any item to a sum less than provid-

---

nal of each house respectively. If any bill or resolution shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature shall, by their adjournment, prevent its return, in which case it shall not become a law without the approval of the Governor. No bill shall become a law after the final adjournment of the Legislature, unless approved by the Governor within fifteen days after such adjournment.

ed in the act and then approve it, as seems to have been the opinion of the Governor, is not here necessary to determine; for, upon the more serious reason that the act under consideration does not fall within the class of acts embraced in section 12, art. 6, the Governor was without power to approve the bill in part and disapprove it in part.

*Trapp,* 113 P. at 913.

¶ 15 The unanswered query in *Trapp* was answered in the negative in *Peebly v. Childers,* 1923 OK 595, 95 Okla. 40, 217 P. 1049, 1053. No. 6 of the *Syllabus* to *Peebly v. Childers* invalidated the Governor's line-item reduction of the amount appropriated for University salaries from $700,000 to $500,000 for the 1924 fiscal year and from $750,000 to $500,000 for the 1925 fiscal year. Also, the fundamental principles governing the application of Article 6, §§ 11 and 12 were enunciated in the *Syllabus by the Court* in *Peebly v. Childers:*

1. The act of the Legislature involved herein is a bill making appropriations of money embracing distinct items and the governor's veto power in relation to such bill, or any distinct item thereof, is defined by section 12, art. 6, Williams' Constitution.

2. Except as provided in the Constitution of this state, the three departments of government, legislative, executive and judicial, are required to be separate and distinct, so that neither shall exercise the functions properly belonging to either of the others.

3. While engaged in considering bills which have passed both houses of the Legislature and which are presented to him for approval or disapproval, the Governor is acting in a legislative capacity and not as an executive.

4. While exercising this function the Governor is a special agent with powers limited by the Constitution and he can only act in the specified mode and can exercise only the granted powers. If he attempts to exercise them in a different mode, or to exercise powers not given, his act will be wholly ineffectual for any and every purpose.

5. Under section 12, art. 6, Williams' Constitution, which applies in the case at bar, no affirmative action on the part of the Governor is necessary to vitalize an appropriation bill embracing distinct items duly passed by the Legislature. But in order to veto any distinct item of an appropriation bill the governor is required to disapprove the objectionable item in toto.

6. A fair application of the foregoing fundamental principles to the plain provisions of section 12, art. 6, Williams' Constitution leads to the conclusion that the action of the governor in attempting to approve in part and disapprove in part distinct items of the Institutional Appropriation Bill was an unauthorized and futile gesture wholly ineffectual for any purpose.

¶ 16 A year earlier, *Carter v. Rathburn,* 1922 OK 105, 85 Okla. 251, 209 P. 944, set out an elementary explanation of the veto powers granted in Article 6, §§ 11 and 12. The *Carter v. Rathburn* court explained:

Section 11 above applies to all bills as a whole. That is, bills in their entirety. No bill in its entirety becomes a law without compliance with the provisions of said section. Any bill becomes a law as a whole when such provisions are complied with. The provisions are plain and, in our opinion, need no construction further than that they mean what they say.

But in section 12, supra, recognizing the difference between a bill as a whole and a general appropriation bill containing separate, independent items, the Constitution makes express provision as to how such a bill may become a law. The Constitutional Convention seems to have taken cognizance of the fact that general appropriation bills are necessarily made up of numerous, separate, independent items, and in order to relieve such a bill from the restrictions imposed under section 11, supra, and to free it from danger of being defeated as a whole, made provisions whereby separate items in such a bill may be disapproved and cut out by the Governor, without affecting the bill in its entirety.

In order to make the provisions of said section 12 applicable, a bill must be one making an appropriation of money and embracing separate and distinct items; it must pass both houses and be presented to the Governor; if the Governor disapproves any item thereof, he must communicate his disapproval, with his reasons therefor, to the house in which the bill originated, and all items not disapproved shall have the force and effect of law according to the original provisions of the bill find every item so disapproved is void; that is, does not become a law unless such item is repassed by a two-thirds vote, as provided in section 11, supra. In other words, if an item in a general appropriation bill is disapproved by the Governor, there is no law provided in the Constitution by which it may become a law, except by repassage by a two-thirds vote, as provided in section 11, supra.

209 P. at 946–947.

¶ 17 In *Carter v. Rathburn,* the Legislature sent the Governor a general appropriation bill, and, after the Legislature adjourned *sine die,* the Governor line-item vetoed a clerk's salary. Rathburn, a clerk in the State Examiner's office, asked for payment of her salary arguing that the line-item veto was ineffective because the Governor did not return the general appropriation bill to the house of origination as required by Article 6, § 12. The Court in *Carter v. Rathburn* said:

True, the Constitution says, "Any item so disapproved shall be void," and probably true that the phrase "so disapproved" means disapproved while the Legislature is in session, but it does not say that unless it is "so disapproved" it shall have the force and effect of law. And to give such item the force and effect of law is to ... put life into it by a process of abstract reasoning rather than by the plain language of the Constitution. Courts are necessarily vested with the authority to interpret the law and say what it means after it becomes a law. Also they have power to determine that an act has not become a law where constitutional requirements have not been met, but it was never intended that by a mere process of reasoning, however plausi-

ble, courts may breathe life into an act which has not been given life by the plain creative provisions of the Constitution.

209 P. at 949.

¶ 18 The reasoning and the holdings in these early decisions have withstood the test of time. In *Johnson v. Walters,* 1991 OK 107, 819 P.2d 694, the Legislature presented the Governor with two bills: 1) a non-appropriation bill that allocated space in the State Capitol Building, relocated various officials, and authorized the sale of surplus water, and 2) a budget reconciliation bill that made multiple appropriations for separate items and contained multiple other general provisions or non-appropriation legislation. The Governor, on the non-appropriation bill, approved only the section relating to the sale of water, and on the budget reconciliation bill, vetoed several general legislation sections. As in this case, the leaders of the Legislature asked this Court to declare the Governor's partial veto beyond his constitutional authority. *Johnson v. Walters* decided 1) that no part of the non-appropriation bill became law because the Governor's attempt to exercise the line-item veto on a general legislation bill is ineffectual and 2) that all general legislation provisions in the reconciliation budget bill failed to become law by virtue of the Governor's attempted line-item veto of some of the general legislation provisions. While the Court's opinion turned on the one-subject-rule restriction on the Legislature rather than the limited veto power of the Governor, one of the concurring opinions filed in *Johnson v. Walters* relied upon the teachings of our early decisions—including *Regents of State University v. Trapp, Carter v. Rathburn,* and *Peebly v. Childers*—and emphasized that the Governor is not a super-legislator. *Johnson v. Walters,* 1991 OK 107 at ¶¶ 5–7, n. 10–13, 819 P.2d at 703, n. 10–13 (concurring opinion by Kauger, J.).

¶ 19 In this matter, the Legislature passed and the Governor signed a general appropriation bill for fiscal year ending June 30, 2009, for the expenses of the various agencies in the executive, legislative and judicial departments. The general appropriation bill, Enrolled House Bill No. 2276, made appropriations to the Department of Corrections, in

the amount of $483,000,000 from the General Revenue Fund in the State Treasury and $20,000,000 from the Special Cash Fund in the State Treasury or so much thereof as may be necessary to perform the duties imposed upon the Department of Corrections by law and an appropriation to the Ethics Commission in the amount of $667,960 from the General Revenue Fund in the State Treasury or so much thereof as may be necessary to perform the duties imposed upon the Ethics Commission by law. Subsequently, the Legislature sent to the Governor Enrolled Senate Bill No. 1323 (relating to the Department of Corrections)[4] and Enrolled House Bill No. 2286 (relating to the Ethics Commission),[5] that allocated the previously appropriated money to various budget categories, set full-time-equivalent employee limits, and provided for fiscal year limitations, *inter alia.*

¶ 20 The Governor signed both S.B. 1323 and H.B. 2286, but the Governor vetoed by line-item method most of the budget allocations and the fiscal year limitations in S.B. 1323 for the Department of Corrections and a section in H.B. 2286 requiring the Ethics Commissions to expend $50,000 on specified computer software. The line-item vetoes in these two legislative measures are challenged in this original action.

¶ 21 Neither S.B. 1323 nor H.B. 2286 makes appropriations of money from the State Treasury for two or more separate and distinct items so that neither triggers the Governor's line-item veto power granted in Article 6, § 12. Stated plainly, neither S.B. 1323 nor H.B. 2286 of the 2008 Session of the Oklahoma Legislature is an "appropriation bill." The sections in S.B. 1323 and H.B. 2286 which the Governor vetoed by line-item method did not appropriate money. Rather than follow the plain language of Article 6, § 12 and our binding jurisprudence, today, for the first time, we extend the Governor's line-item veto power to general non-appropriation legislation and to general provisions of legislation. Reasoning similar to today's was rejected in *Carter v. Rathburn* and more recently in *Campbell v. White*, 1993 OK 89, at ¶ 19, 856 P.2d at 262, when the Court said

we are not free to expand the meaning of constitutional provisions. When our jurisdiction is invoked, it is our duty to require both the Legislature and the Governor to strictly comply with our Constitution.

¶ 22 The Court today confers upon the Governor super-legislator status by its conclusion that the framers of the Oklahoma Constitution clearly intended the Governor to play a critical role at every stage of the appropriations process. This conclusion, grounded neither in the language of Article 5, § 55 or Article 6, § 12, nor in our extant jurisprudence, is in derogation of the fundamental power of the Legislature to make appropriations.

> The power to make appropriations, for which the Public must pay the taxes, is one of the most sacred rights delegated to legislative bodies, and the law prescribes the exact manner in which such appropriations may be made, and the courts should jealously guard against straining the provisions of law in order to make an appropriation valid.

*Carter v. Rathburn*, 209 P. at 950.

¶ 23 After the petitioners sought to invoke our jurisdiction, the Governor urged that the petitioners have not presented a controversy suitable for this Court's assumption of jurisdiction and declaratory judgment. Yet, the Court in today's decision fails to address this issue. I find it necessary to address this issue based on the petitioners' urging that we grant only prospective relief.

¶ 24 To invoke this Court's original jurisdiction, the petitioners are required to present a justiciable controversy and to show a *"sufficient immediacy and reality"* as to warrant the pronouncement of judgment. *Dank v. Benson*, 2000 OK 40, ¶ 9, 5 P.3d 1088, 1092. The petitioners assert that "the Court's pronouncement will provide future guidance for both the Governor and the Legislature." Future guidance in the upcoming legislative session is not the type of urgency which may invoke this Court's original jurisdiction. *See id.*

---

4. Attachment A to this dissent.

5. Attachment B to this dissent.

¶ 25 The petitioners in their application state that they are not seeking to "invalidate those two bills, but rather ask the Court to declare the attempted use of the veto unconstitutional and to grant prospective declaratory relief to preclude similar unlawful acts by the Chief Executive in the future." Thus, the petitioners in their application seek only prospective relief so that the two bills at issue here will not be invalidated.

¶ 26 In *Dank v. Benson* this Court denied the petitioners application to assume original jurisdiction for lack of a justiciable controversy. Here, as in *Dank*, the petitioners in their application do not seek to have any specific legislation invalidated but seek to have this Court make a pronouncement to prevent potential future actions by an elected government officer. Evidently because of the Governor's reliance on *Dank*, during oral argument, the petitioners' made an oral plea that the two bills were invalid. Nonetheless, the petitioners seek to have this Court determine that the bills are invalid, but that the decision not affect their effectiveness by making our pronouncement prospective.

¶ 27 Because to give the relief requested by the petitioners would weigh against this Court assuming jurisdiction and would fail, in my opinion, to present a justiciable controversy and because of the weight of the matter presented, I think the application should be considered amended to reflect petitioners' assertions made at oral argument urging the bills be declared invalid. As so amended, the application and petition present a controversy involving the highest levels of state government and raising first impression, *publici juris* questions that are important to the law of state government.

¶ 28 Were I writing for the Court, I would assume original jurisdiction and enter a declaratory judgment. I would find that 1) the two bills under attack here are not appropriation bills, 2) the provisions attempted by the Governor to be vetoed by the line-item method are not items of appropriations, and 3) the Governor's attempted line-item veto of those provisions is ineffective because it is not authorized by the Oklahoma Constitution. I would also find that the Governor placed his approval upon each bill by his signature, although he could have vetoed each bill in its entirety. I would hold the Governor's attempted line-item vetoes are unauthorized and ineffective and did not prevent the two bills from becoming the law of this state when the Governor signed them. I would declare S.B. 1323 and H.B. 2286 of the 2008 Oklahoma Legislature to be valid in toto and to survive intact the attempted line-item veto that is unauthorized by the Oklahoma Constitution.

ATTACHMENT A

ENROLLED SENATE
BILL NO. 1323

By: Johnson (Mike),
Crutchfield, Myers and
Adelson of the Senate

and

Miller and Jones of the
House

An Act relating to the Department of Corrections;
requiring budgeting of funds in certain categories
and amounts; requiring certain performance measures;
providing for duties and compensation of employees;
limiting salary of the Director; authorizing
employment of certain percentage of employees in the
unclassified service; providing budgetary
limitations; authorizing certain agreement for
construction projects; authorizing purchase of
certain building, real property and all appurtenances
thereto; requiring and prohibiting certain budget
practices; providing lapse dates; providing an
effective date; and declaring an emergency.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:

SECTION 1. For the fiscal year ending June 30, 2005, the
Department of Corrections shall budget all funds in the following
categories and amounts:

| Category | Appropriation | Total |
|---|---|---|
| Administration | $ 34,165,474.00 | $ 48,175,236.00 |

| | | |
|---|---|---|
| Institutions and Field Operations | 217,143,453.00 | 264,371,769.00 |
| Contract Beds | 116,854,269.00 | 121,778,274.00 |
| Community Corrections | 60,779,205.00 | 60,779,205.00 |
| Treatment and Rehabilitation Services | 78,057,559.00 | 92,883,187.00 |
| TOTAL | $503,090,000.00 | $566,907,691.00 |

*(VETO — table struck through)*

The agency shall develop outcome-based performance measures for each budget category.

SECTION 2. The duties and compensation of employees, not otherwise prescribed by law, necessary to perform the duties imposed upon the Department of Corrections by law shall be set by the Director of the Department of Corrections. The salary of the Director of the Department of Corrections shall not exceed One Hundred Thirty-two Thousand Three Hundred Nine Dollars ($132,309.00) per annum, payable monthly for the fiscal year ending June 30, 2009. The Department of Corrections for the fiscal year ending June 30, 2009, shall be authorized to employ up to six percent (6%) of its total authorized full-time-equivalent employees in the unclassified service and shall be subject to the following budgetary limitations on full-time-equivalent employees and expenditures excluding expenditures for capital and special projects, except as may be authorized pursuant to the provisions of Section 3603 of Title 74 of the Oklahoma Statutes:

| Budgetary Limitation | Amount |
|---|---|
| Full-time-equivalent Employees | 5,894.6 |
| Lease-Purchase Agreements | $10,400,000.00 |

SECTION 3. The Department of Corrections is hereby authorized to enter into an agreement with the state agencies to utilize prison inmates for construction projects subject to written restrictions and conditions regarding security classification and other matters related to the control of inmates and public safety. Before

utilizing inmates, the Department of Corrections shall enter into a written agreement concerning, but not limited to, liability, funding, pay, public security and transportation. Provided further, prison inmates shall not be used to replace any current state agency employees.

SECTION 4. The Department of Corrections, subject to funds available, is authorized to purchase a building together with five acres of land and all appurtenances thereto in the City of Healdton, Oklahoma, for a negotiated price not to exceed One Hundred Seventy-five Thousand Dollars ($175,000.00).

SECTION 5. Appropriations made by Sections 95 and 96 of Enrolled House Bill No. 2276 of the 2nd Session of the 51st Oklahoma Legislature, not including appropriations made for capital outlay purposes, may be budgeted for the fiscal year ending June 30, 2009 (hereafter FY-09), or may be budgeted for the fiscal year ending June 30, 2010 (hereafter FY-10). Funds budgeted for FY-09 may be encumbered only through June 30, 2009, and must be expended by November 15, 2009. Any funds remaining after November 15, 2009, and not budgeted for FY-10, shall lapse to the credit of the proper fund for the then current fiscal year. Funds budgeted for FY-10 may be encumbered only through June 30, 2010. Any funds remaining after November 15, 2010, shall lapse to the credit of the proper fund for the then current fiscal year. These appropriations may not be budgeted in both fiscal years simultaneously. Funds budgeted in FY-09, and not required to pay obligations for that fiscal year, may be budgeted for FY-10, after the agency to which the funds have been appropriated has prepared and submitted a budget work program revision removing these funds from the FY-09 budget work program and after such revision has been approved by the Office of State Finance.

*VETO*

SECTION 6. This act shall become effective July 1, 2008.

SECTION 7. It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, by reason whereof this act shall take effect and be in full force from and after its passage and approval.

Passed the Senate the 21st day of May, 2008.

_____
Presiding Officer of the Senate

Passed the House of Representatives the 22nd day of May, 2008.

_____
Presiding Officer of the House
of Representatives

**OFFICE OF THE GOVERNOR**

Received by the Governor this 23rd

day of May 20 08,

at 9:40 o'clock P M.

By: _____

Approved by the Governor of the State of Oklahoma the 6th day of

June , 20 08, at 12:54 o'clock P M.

_____
Governor of the State of Oklahoma

**OFFICE OF THE SECRETARY OF STATE**

Received by the Secretary of State this

6th day of June 20 08

at 1:05 o'clock P M.

By: _____

ATTACHMENT B

ENROLLED HOUSE
BILL NO. 2286

By: Miller and Jones of the
House

and

Johnson (Mike),
Crutchfield, Myers and
Adelson of the Senate

An Act relating to the Ethics Commission; requiring
budgeting in certain categories and amounts;
requiring certain performance measures; providing for
duties and compensation of employees; providing
budgetary limitations; specifies maximum amount for
certain expenditure; providing lapse dates; requiring
and prohibiting certain budget procedures; providing
an effective date; and declaring an emergency

BE IT ENACTED BY THE PEOPLE OF THE STATE OF OKLAHOMA:

SECTION 1. For the fiscal year ending June 30, 2009, the Ethics
Commission shall budget all funds in the following categories and
amounts:

| Category | Appropriation | Total |
|---|---|---|
| Administration/Policy Reviews/Investigations | $340,000.00 | $534,000.00 |
| Registration Services/Hearings | 327,960.00 | 456,960.00 |
| TOTAL | $667,960.00 | $990,960.00 |

The agency shall develop outcome based performance measures for
each budget category.

SECTION 2. The duties and compensation of employees, not otherwise prescribed by law, necessary to perform the duties imposed upon the Ethics Commission by law shall be set by the Executive Director. The Ethics Commission for the fiscal year ending June 30, 2009, shall be subject to the following budgetary limitations on full-time-equivalent employees and expenditures excluding expenditures for capital and special projects, except as may be authorized pursuant to the provisions of Section 3603 of Title 74 of the Oklahoma Statutes:

| Budgetary Limitation | Amount |
|---|---|
| Full-time-equivalent Employees | 7.0 |
| Lease-Purchase Agreements | $0.00 |

SECTION 3. Of the amount appropriated by Section 39 of Enrolled House Bill No. 2276 of the 2nd Session of the 51st Oklahoma Legislature, the Ethics Commission is hereby directed to expend an amount, not to exceed Fifty Thousand Dollars ($50,000.00) for the fiscal year ending June 30, 2009, to purchase computer software of the type used for campaign finance reports and data by the Federal Election Commission, and may not expend such amount for any other purpose. If necessary, such software shall be modified to permit the reporting of the aggregate total contributions of each contributor contributing in excess of the reporting threshold, as set forth in the Rules of the Ethics Commission, for the campaign-to-date for candidate committees and year-to-date for other committees, and all other information required to be reported pursuant to the Rules of the Ethics Commission.

SECTION 4. Appropriations made by Section 39 of Enrolled House Bill No. 2276 of the 2nd Session of the 51st Oklahoma Legislature, not including appropriations made for capital outlay purposes, may be budgeted for the fiscal year ending June 30, 2009 (hereafter FY-09) or may be budgeted for the fiscal year ending June 30, 2010 (hereafter FY-10). Funds budgeted for FY-09 may be encumbered only through June 30, 2009, and must be expended by November 15, 2009. Any funds remaining after November 15, 2009, and not budgeted for FY-10, shall lapse to the credit of the proper fund for the then current fiscal year. Funds budgeted for FY-10 may be encumbered only through June 30, 2010. Any funds remaining after November 15, 2010, shall lapse to the credit of the proper fund for the then current fiscal year. These appropriations may not be budgeted in both fiscal years simultaneously. Funds budgeted in FY-09, and not

required to pay obligations for that fiscal year, may be budgeted for FY-10, after the agency to which the funds have been appropriated has prepared and submitted a budget work program revision removing these funds from the FY-09 budget work program and after such revision has been approved by the Office of State Finance.

SECTION 5. This act shall become effective July 1, 2009.

SECTION 6. It being immediately necessary for the preservation of the public peace, health and safety, an emergency is hereby declared to exist, by reason whereof this act shall take effect and be in full force from and after its passage and approval.

Passed the House of Representatives the 15th day of May, 2008.

_____
Presiding Officer of the House of
Representatives

Passed the Senate the 20th day of May, 2008.

_____
Presiding Officer of the Senate

**OFFICE OF THE GOVERNOR**

Received by the Governor this 21st

day of May 2008

at 2:33 o'clock P M

By: _____

Approved by the Governor of the State of Oklahoma the 6th day of

June 2008, at 12:30 o'clock P M

_____
Governor of the State of Oklahoma

**OFFICE OF THE SECRETARY OF STATE**

Received by the Secretary of State this

10th day of June 20 08

at 12:54 o'clock P M

By: _____

OPALA, J., with whom WINCHESTER, J., joins, dissenting

¶1 I write separately from others to explain why I join the dissent's analysis of the law that governs this original proceeding.

¶2 An appropriation is a legislative act of allocating money to an agency in a sum certain. A legislative direction that limits the quantum of an agency's authority to spend money out of its appropriation for certain authorized categories is not an appropriation. It is rather an allocation formula for use of appropriated money by limiting the amount of an agency's spending for approved categories. An allocation of money from an agency's appropriation to enumerated categories does not appropriate money but rather restricts an agency's spending ability from funds that stand appropriated. Art. 6, § 12, Okl. Const.

¶3 By line-item veto the governor has the power to nullify an appropriation of money but not to invalidate a legislative direction for

an agency's internal allocation of its appropriated funds. Today's pronouncement stretches, *sans* legal warrant, the governor's line-item veto power to include legislative enactments that do not make appropriations but merely restrict an agency's freedom to spend its appropriated funds. A governor's line-item veto **must be directed to an appropriation, not to a legislative direction about spending appropriated funds.** When it targets a directive, **it loses its legal characteristic and its constitutional force.** Simply stated, it stands reduced to a nullity—an impermissible line-item veto of a legislative spending directive.[1]

¶ 4 A constitutional grant of power cannot be judicially enlarged by expanding the language of the fundamental law's grant beyond the limits of its dictionary-revealed meaning.[2]

1. If a legislative act, which contains an appropriation to a single institution or agency, is divided into parts, the governor's power of line-item veto may not be invoked to nullify one or several severed portions of what is a single appropriation. To put it in somewhat clearer terms, a legislative division of a single appropriation of money to an institution will not provide legal support for the governor's use of line-item veto to nullify but a part or parts of an appropriation that in law stands as a single integrity. *Regents of State University v. Trapp, State Auditor*, 1911 OK 62, ¶ 0, syl., 13 P. 910, 28 Okl. 83.

2. *In re. Protest Against the Tax Levy*, 1998 OK 43, ¶ 7, 959 P.2d 580, 582; *Chickasha Cotton Oil Co. v. Grady County*, 1936 OK 318, ¶ 18, 58 P.2d 590, 177 Okl. 240.